## MORGAN v. UNITED STATES.
### HUST v. SAME.

Circuit Court of Appeals, Seventh Circuit.
January 25, 1929.

Rehearing Denied April 12, 1929.

Nos. 4045, 4046.

Edwin L. Weisl, of Chicago, Ill., for appellant Morgan.

Benj. P. Epstein, of Chicago, Ill., for appellant Hust.

Edward J. Hess, of Chicago, Ill., for the United States.

Before PAGE and ANDERSON, Circuit Judges, and CARPENTER, District Judge.

ANDERSON, Circuit Judge. The appellants were convicted upon an indictment which charged, in substance, that the South Side Trust & Savings Bank was a member of the Federal Reserve system, that one Peter Hein was an employee of said member bank, and that, while an employee thereof, with intent to injure and defraud it, on August 31, 1926, he unlawfully, willfully, and feloniously abstracted the sum of $7,200 from the bank; that said Hein, while so acting as an employee of the bank, on said August 31, caused a cashier's check to be issued by the bank to appellant Morgan, wherein and whereby the sum of $7,200 was ordered paid to said Morgan out of the moneys of the bank, for which Morgan did not, nor did any person on his behalf, pay, deposit, or give the bank any money or anything of value; that the check was delivered by Hein to Morgan, and in due course of banking business was paid by the South Side Trust & Savings Bank. The indictment further charged that the appellants, Morgan and Hust, on August 31, 1926, with intent to injure and defraud as alleged, did unlawfully, willfully, knowingly, and feloniously aid and abet said Hein to abstract the $7,200.

The errors relied upon as grounds for reversal are:

(1) "There is no evidence to sustain the charge * * * that Hust and Morgan aided and abetted Hein to abstract the sum of $7,200 by means of the cashier's check of August 31, 1926."

(2) "There is no competent evidence that

the South Side Trust & Savings Bank was a member of the Federal Reserve system or a member bank."

(3) "The court erred in failing to require the government to rebut the presumption of harmful error arising from the facts set forth in the affidavit of juror Boecker."

(4) "Government counsel, in argument, improperly referred to the failure of the defendants to take the stand in their own behalf."

1. There was evidence before the jury sufficient to warrant it in finding the following facts:

That the South Side Trust & Savings Bank was a member of the Federal Reserve system (this will be further discussed under error No. 2). That Peter Hein was a teller of said member bank, and was at the time of the alleged offense 22 years of age, receiving from the bank for his services $47.50 a week, and that he had no other resources and owned no property whatever, except a Chevrolet car. That the appellants, Morgan and Hust, were bookmakers—horserace gamblers. That Morgan was past 60 years of age, and was the employee of Hust in the bookmaking business, receiving as his wages $50 a week for that service. That Hein first stole money from the bank by "holding out" deposit tickets, then by adding sums to withdrawal slips, and in the months of May, June, July, and August, 1926, he abstracted money by use of cashier's checks. That during these months he delivered to Morgan four other cashier's checks, which, with the one for $7,200, aggregated $35,482. That he lost in his dealings with appellants about $250,000, and that his winnings amounted to about $100,000.

That Hein lost in gambling with appellants all the money which he stole from the bank. (After describing his numerous thefts from the bank and his procuring and delivering to Morgan, in payment of his gambling debts, the cashier's checks above mentioned, Hein testified: "As to what I did with this money that I testified to having withdrawn and kept from that bank, I gambled it. I gave it to William Morgan.")

That on the date alleged, August 31, 1926, Hein procured, in some way, the cashier's check for $7,200 and delivered it to Morgan on a street corner in the city of Chicago, away from the bank. That in Hein's early gambling transactions with Morgan he both paid to and received from him money at the bank. That Hein told Morgan it might cause suspicion for him to continue to come to the bank so frequently, and arranged to meet him at other places, at various street corners in the city of Chicago. That all the cashier's checks above mentioned were delivered to Morgan at various street corners in the city of Chicago, under arrangement with Hust by telephone, Hust telling Hein how much he owed on his gambling transactions, and Hein asking that Hust have Morgan meet him (Hein) at particular places, which Morgan did, and at which times Hein delivered to him the checks in question.

That the check of August 31, 1926, for $7,200 was made payable to the order of appellant William Morgan, was indorsed by him to appellant Henry Hust, and by Hust indorsed and deposited for credit to his account in the Stock Yards Trust & Savings Bank, and by the latter bank collected from the South Side Trust & Savings Bank.

The evidence not only warrants the finding of the above facts, but it is uncontradicted. From these facts it appears that Hein abstracted the $7,200 from the bank, and that this was accomplished by the use of the cashier's check for $7,200 as alleged; that Morgan received the check and indorsed it to Hust, and that Hust indorsed it and put it into his bank, collected the $7,200, and caused it to be withdrawn from the South Side Trust & Savings Bank, thus establishing not only that Hein abstracted the $7,200, but also that appellants Morgan and Hust aided and abetted him in such abstraction.

The only possible question that could be raised upon these facts is whether or not appellants had the guilty intent to injure and defraud the bank. That they materially aided and assisted Hein in abstracting the $7,200 cannot be seriously questioned, and that they rendered this aid and assistance with the intent to injure and defraud the bank—that is, get from it, through the unlawful abstractions of Hein, $7,200—is equally plain.

Morgan, a professional gambler, three times the age of Hein, knowing that he was a teller in a bank, obviously upon a modest salary, received from him in money and through cashier's checks more than $150,000 (Hein testifying that in his transactions with Morgan he lost $250,000 and that his winnings amounted to about $100,000). The inference that Morgan aided and abetted Hein in abstracting the $7,200 from the bank, with the intent charged, is fully warranted by the evidence.

The evidence does not show Hust and Hein to have been together, as it shows Morgan and Hein to have been, but it does show that the cashier's checks were delivered to Morgan at places agreed upon between Hust and Hein, on street corners away from

the bank, for gambling debts which Hein owed Hust; that Hein was paying to Hust the large sums of money represented by these cashier's checks for his gambling debts to Hust, and, to prevent suspicion at the bank, was paying them at places and in ways agreed upon between Hein and Hust. Though the evidence as to Hust's guilty participation is not so voluminous as that as to Morgan, it clearly shows, or at least is sufficient to warrant the jury in finding, that Hust actively and consciously participated—that is, aided and abetted Hein—in the unlawful abstraction of the $7,200.

2. The second ground for reversal is that there is no competent evidence that the South Side Trust & Savings Bank was a member of the Federal Reserve system or a member bank. Appellants' counsel confuse the competency of evidence with its probative force or effect. We will treat this, however, as an assertion that there is no evidence to support the averment that the South Side Trust & Savings Bank was a member of the Federal Reserve system.

The vice president of the South Side Trust & Savings Bank was put upon the stand by the government and testified that he was and had been for six months vice president of that bank, that prior to that time he had been assistant cashier for eight years, and that the corporate name of the institution was the South Side Trust & Savings Bank of Chicago. He also was asked, "Now, since 1924 and down to date, what, if any, transactions has the South Side Trust & Savings Bank had with the Federal Reserve Bank of Chicago?" to which he replied, "Well, we have maintained an account there, which is a requirement of the Federal Reserve Bank, and from time to time we have rediscounted our rather—yes, rediscounted notes and things of that sort; borrowed money from the Federal Reserve also." The government then offered, and there was received in evidence, a certificate issued by the Federal Reserve Bank to the South Side Trust & Savings Bank for 600 shares of the stock of the Federal Reserve Bank.

Thereafter the government produced as a witness the auditor of the Federal Reserve Bank of Chicago, who testified that he had been auditor of that bank since 1916, that he knew the signatures of the officers attached to the certificate, and that they were genuine. This authorized the admission of the certificate in evidence. In answer to a question, "Do you know whether or not the South Side Trust & Savings Bank of Chicago was a member of the Federal Reserve Bank of Chicago —the Federal Reserve system—in 1926?" he answered, "Yes; I do know that they were a member in 1926 of the Federal Reserve Bank of Chicago."

We perceive no reason, and none is suggested, why the auditor of the bank could not testify of his own knowledge that the South Side Trust & Savings Bank was a member of the bank of which he was the auditor. The argument made that his testimony and the certificate are not the best evidence is without merit. They are sufficient to warrant the finding that the South Side Trust & Savings Bank was a member of the Federal Reserve Bank.

3. The record shows that, upon the return of the verdict of guilty, appellants, by their respective counsel, moved for a new trial. The motion was oral; the record shows no reasons for it, and we have no way of ascertaining what the grounds of the motion were. It appears from the record that thereafter, on March 10, 1928, the motion came on for hearing, and that appellants, in pursuance of leave of court thereunto had and obtained, filed an affidavit of Theodore F. Boecker, one of the jurors in said cause. This affidavit sets forth that after the jury retired to consider of its verdict, and while it was still deliberating, Boecker requested from the bailiff in charge of the jury permission to attend the ceremony of the mass at a Catholic church; that the bailiff informed him that such proceeding would not be permitted; that thereupon affiant inquired of the bailiff whether he, the juror, could have a priest visit him at the quarters then and there occupied by the jurors for the purpose of obtaining communion from the priest; that the bailiff acceded to the request, and thereupon affiant, in the presence and with the consent of the bailiff, over the telephone had a conversation with a priest of the Catholic church; and that thereafter a priest appeared at the quarters occupied by the jury, and met affiant in the presence of the other jurors, whereupon affiant and the priest went into the room of the bailiff, and in that room affiant and the priest were the only persons present, and while the door of the room was shut, and out of the presence of any of the other jurors and the bailiff, the priest gave the affiant communion as desired.

Thereupon the motion for a new trial was overruled by the court, to which ruling appellants excepted. It is insisted that "the court erred in failing to require the government to rebut the presumption of harmful error arising from the fact set forth in the affidavit of juror Boecker." To support this

contention Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, is cited. In the Mattox Case it was decided that the court erred in refusing to hear and consider affidavits setting up communications made to the jury during their deliberations. The court held that, while the granting or denying of the motion for a new trial was discretionary with the trial court, it was error to refuse to permit the filing and to consider the affidavits. In that case the affidavits contained matters which were highly prejudicial to a fair consideration of the case. The most that the affidavit in the instant case shows is that the priest administered the sacrament of communion to the juror.

While the action of the bailiff in permitting this to be done was reprehensible, a violation of his oath as bailiff, and cannot be too severely condemned, we are not able to see how it in any way influenced the jury in their deliberations or affected the verdict returned.

█ 4. It is complained under this alleged error that government counsel in his argument improperly referred to the failure of the defendants to take the witness stand in their own behalf. The statute (28 USCA § 632) provides that a defendant in a criminal charge "shall, at his own request, but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him." The matter complained of, as shown by the record, is this:

Counsel for the government in his closing argument said: "What is it counsel wants the government to produce in his criticism of me in the presentation of this case? What does he want me to do? Does he want me to call Hust and Morgan to the stand before you gentlemen and have them tell you what? No; the criminal laws don't permit it." Whereupon counsel for appellants said, "I object to counsel's last remarks." Government's counsel then said, "It is strictly legitimate." The court then said: "Counsel has no right to refer to putting the defendants on the stand. The jury are instructed not to consider that at all." Counsel for appellants then said, "Exception."

It does not appear in the record what the criticism was that government's counsel referred to in his remarks. It may have been something said by counsel for appellants which fully warranted the remarks, but beyond that the district attorney said nothing whatever about the defendants' not having availed themselves of their privilege to testify. The question, "Does he want me to call Hust and Morgan to the stand before you gentlemen and ask them what?" can hardly be construed into an observation that they did not see fit to take the stand and testify. The remark of government counsel, "No; the criminal laws don't permit it," would suggest that he was answering a criticism for not calling them to the stand, which is a very different thing from commenting upon their failure to avail themselves of the privilege of taking the stand in their own behalf. But, even if these remarks were not proper, the court took out all possibility of injury to appellants by instructing the jury not to consider them at all.

The judgments are affirmed.